2021 IL App (1st) 171715-U

No. 1-17-1715

Order filed December 1, 2021

THIRD DIVISION

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County |
| v. | ) ) | No. 07-CR-21741 |
| CHARLES LEE, | ) ) | Honorable Judge Michael McHale |
| Defendant-Appellant. | ) ) | Judge Presiding |

_____

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Gordon and Justice McBride concurred in the judgment.

**ORDER**

¶ 1    *Held*: Affirmed. Trial court properly dismissed postconviction petition alleging that State knowingly suborned perjured testimony and that trial and appellate counsel were ineffective for failing to challenge admissibility of petitioner's handwritten statement at trial.

¶ 2    In November 2006, Bernard Hawkins and Cordell "KP" Peeples were shot and killed in a house in Chicago. The State alleged that petitioner Charles Lee, along with Rashawn "JB" Carter, murdered Hawkins and Peeples after a drug deal went wrong. A jury convicted petitioner

of two counts of first-degree murder, and he was sentenced to natural life in prison. A separate jury acquitted Carter.

¶ 3    After his conviction was upheld on direct appeal (*see People v. Lee*, 2012 IL App (1st) 102936-U), petitioner filed a postconviction petition. The court advanced the petition and appointed counsel, who filed an amended petition. The State moved to dismiss it at the second stage, and the court granted the State's motion without conducting an evidentiary hearing.

¶ 4    On appeal, petitioner claims he made a substantial showing that the State knowingly used perjured testimony from Derrick Cotton, who testified before the grand jury that petitioner made incriminating statements about the murders. The State's knowing use of that perjured testimony later at his trial violated his due process rights, petitioner claims. Petitioner further alleges that his trial and appellate counsel were ineffective for failing to challenge the admission of a handwritten statement Cotton made, which was also admitted at trial. We affirm the dismissal of the petition in all respects.

¶ 5                                I. BACKGROUND

¶ 6    The order affirming petitioner's conviction on direct appeal lays out the evidence at trial in more detail. See *id*. We summarize the details relevant to the issues before us now.

¶ 7    In November 2006, Tyrone Gordon came to Chicago with $32,000 in cash to buy drugs to "mule" back to Tennessee. In Chicago, he sought help from Peeples and Hawkins, with whom he had worked before. Over several days, the three men hung out while they put together the deal. During this time, Gordon met petitioner and Carter one day while playing pool.

¶ 8    On November 18, 2006, Peeples, Hawkins, and Gordon went to a house near Blackstone and 92nd streets. Once there, they waited outside to complete the drug buy. Gordon got cold and asked to sit inside Peeples's van while the trio waited. Eventually, petitioner and Carter arrived

in a grey Dodge Charger. One of them carried a single bag. Shortly thereafter, another van arrived. Gordon saw Hawkins go to the van, speak to the people inside it, take something from them, and put it underneath his coat. The van then left. Peeples, Hawkins, Carter, and petitioner then went inside the house, while Gordon waited in the van and dozed off.

¶ 9     Sometime later, Gordon heard a noise and saw petitioner and Carter running out of the house. One of them—Gordon couldn't remember who—had two bags in his hand. Gordon heard someone—again, he couldn't remember who—say "let's get the f*** out of here," and both men got into the Charger and drove off. Gordon stayed in the van and waited for Peeples and Hawkins to return, but after about 10 minutes, he got out and walked to the house to check on them. He opened the door, saw blood and Peeples's dead body on the ground, and fled the house.

¶ 10     About 90 minutes later, Gordon arrived at a Taco Bell and told Chandra Gillman, an employee and Hawkins's girlfriend, what had happened. Gordon admitted he did not call the police in the time it took him to walk from the house to the Taco Bell, nor did he seek help from anyone else. Gillman left to go to the house and called the police en route. Gillman said when she got there, she peeked in the house and saw Peeples's body on the ground, but she herself did not go inside. According to the medical examiner, both Hawkins and Peeples had been shot multiple times and died from their wounds.

¶ 11     Gordon spoke to officers on the scene the day of the murders, then later again the next day, when he identified Carter in a photo array. In January 2007, Gordon spoke to officers again and tentatively identified petitioner in a photo array.

¶ 12     Zenobia Williams, Carter's girlfriend at the time of the murders, testified that she met Carter in a hotel room on November 19, 2006, a day after the murders. While there, she saw Carter with two ounces of cocaine. During her visit, Carter's phone rang at least five times; when

Carter finally answered it, Williams heard petitioner tell Carter to stop "running" his mouth. Williams looked outside the hotel window and saw petitioner sitting in a grey Charger in the parking lot.

¶ 13    In February 2007, police arrested Derrick Cotton, petitioner's cousin, on an unrelated retail theft charge. On February 21, Cotton spoke to Assistant State's Attorney (ASA) Patrick Keane and the detective investigating the case and agreed to make a written statement about what he knew regarding Peeples's and Hawkins's murder.

¶ 14    In that statement, Cotton said that, on three different occasions in his brother's barbershop in December of 2006, he heard petitioner make comments about the murders. First, sometime in the middle of the month, petitioner told the people at the barbershop that if he was arrested, people should tell police he was at a friend's house drinking and playing cards. Second, later that month, Cotton asked petitioner what happened to Peeples. Petitioner pointed to Carter and told Cotton it was "Folk's work." Then, on New Year's Eve 2006, petitioner told Cotton that what happened to Peeples and Hawkins was supposed to be a robbery, but Carter had "f***** up."

¶ 15    The day after he spoke to Keane, Cotton testified in front of a grand jury. His testimony to the grand jurors was substantively the same as his signed handwritten statement to Keane.

¶ 16    Cotton changed his story at petitioner's trial, however. When asked about the conversations in the barbershop, Cotton first claimed he did not remember what petitioner said. The State confronted Cotton with both his handwritten statement and a copy of the transcript of his grand jury testimony. He acknowledged signing the handwritten statement but said he had not been allowed to review or make changes to it before he signed it. He also admitted he testified before the grand jury but said he was high when he did so. Under further questioning,

Cotton eventually conceded that petitioner did tell people at the barbershop to tell police he was at a friend's house drinking and playing cards and that petitioner insinuated Carter had killed Peeples and Hawkins. Cotton said he could not remember petitioner saying the murders were supposed to be a robbery, however.

¶ 17    With help from the ASAs who prepared Cotton's handwritten statement and presented him to the grand jury, the State entered into evidence both Cotton's statement and a copy of the transcript of the grand jury testimony, the latter over petitioner's objection.

¶ 18    In both closing and rebuttal argument, the State argued that petitioner's statements to Cotton proved he and Carter killed Peeples and Hawkins while trying to rob them. The State contended Cotton had no reason to lie to the grand jury and told the truth in that testimony. Petitioner, meanwhile, suggested Gordon was the real murderer and that the State did not prove its case.

¶ 19    At the end of arguments, the court instructed the jury with Illinois Pattern Instruction-Criminal (4th) 3.11 (IPI Criminal 3.11) as follows:

> "The believability of a witness may be challenged by evidence that on some
> former occasion he made a statement that was not consistent with his testimony in
> the case. Evidence of this kind may be considered by you only for the limited
> purpose of deciding the weight to be given the testimony you heard from the
> witness in this courtroom.
>
> However, you may consider a witness' earlier inconsistent statement as evidence
> without this limitation when
>
> One, the statement was made under oath at a proceeding; or

Two, the statement narrates, describes or explains an event or condition that the

witness has personal knowledge of; and

The statement was written or signed by the witness; or

The witness acknowledged under oath that he made the statement."

¶ 20    During deliberations, the jury requested a copy of Cotton's grand jury testimony. After

the parties agreed to redact any information that had not been presented during trial, the court

gave the jurors the redacted copy. The jury convicted petitioner of murder but found that the

State did not prove he personally discharged a firearm during the crime. Per statute, the court

sentenced petitioner to serve the remainder of his natural life in prison.

¶ 21    On direct appeal, petitioner argued only that the evidence was insufficient to prove him

guilty because the State's case was entirely circumstantial, and the State's witnesses were

unworthy of belief. *Lee*, 2012 IL App (1st) 102936-U, ¶ 23. We affirmed his conviction. *Id.* ¶ 36.

¶ 22    In a footnote of his brief, petitioner argued that Cotton's handwritten statement was

improperly admitted. *Id.* ¶ 14 n.2. This court, in its own footnote, observed that "the same

subject matter was discussed by Cotton under oath before the grand jury and that these

statements were properly admitted under Section 110-10.1(c)(1) (725 ILCS 5/115-10.1(c)(1)."

Since petitioner did not raise any argument about the handwritten statement, we did not address

it further. *Id.*

¶ 23    In April 2013, petitioner filed a *pro se* postconviction petition with numerous allegations

that trial and appellate counsel were ineffective. The court docketed the petition and appointed

counsel to represent petitioner. Three years later, counsel filed an amended petition, raising five

arguments. Among additional allegations of counsel's ineffectiveness, the petition included a

claim that Cotton's handwritten statement should not have been admitted, and trial and appellate counsel were ineffective for failing to challenge its admission.

¶ 24    Petitioner also alleged that Cotton lied to the grand jury about what petitioner said in the barbershop, and that the State knew Cotton was lying. To support this claim, petitioner attached an affidavit from Cotton. In that affidavit, Cotton said he was a heroin addict when he was arrested in February 2007, he needed a fix, and he would have said anything to be released. He lied to investigators that petitioner made the statements in the barbershop; in fact, he never heard petitioner say anything about the murders. Cotton also said he signed the handwritten statement because he needed drugs but was in custody. Cotton then averred that he "told the grand jury what the police and the assistant state's attorney wanted me to tell them."

¶ 25    Shortly thereafter, counsel also filed a petition for relief pursuant to 625 ILCS 5/2-1401 (West 2012) (section 2-1401 petition). Petitioner argued that the newly discovered evidence that Cotton committed perjury should render his conviction void. Postconviction counsel said they filed the additional petition because, under section 2-1401, petitioner could obtain relief even if the State *unknowingly* used Cotton's perjured testimony. To obtain relief in postconviction proceedings, which requires a constitutional claim, he would have to prove the State *knowingly* used the perjured testimony.

¶ 26    The trial court, on the State's motion, dismissed both petitioner's amended postconviction and the 2-1401 petitions without an evidentiary hearing. He now appeals.

¶ 27                                II. ANALYSIS

¶ 28    Before us, petitioner presents two claims. First, he argues that his petition made a substantial showing that the State knowingly used Cotton's perjured testimony to convict him. Second, he claims his trial and appellate counsel were ineffective when neither challenged the

State's use of Cotton's handwritten statement as substantive evidence. Although we allowed petitioner to amend his notice of appeal to seek review of his section 2-1401 petition's dismissal, he has abandoned any review of it. Accordingly, any claims related to that petition are now forfeited. *See* Ill. S.Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

¶ 29 The Postconviction Hearing Act permits those incarcerated to attack their underlying conviction by alleging it resulted from a substantial denial of their rights under the U.S. or Illinois constitutions. 725 ILCS 5/122-1 et seq. (West 2019); *People v. Coleman*, 183 Ill. 2d 366, 378 (1998). Proceedings under the Act are separated into three distinct stages. *People v. Edwards*, 197 Ill. 2d 239, 244 (2001).

¶ 30 At the second stage, which petitioner here reached, counsel is appointed and charged with amending the petition to properly present the petitioner's claims. 725 ILCS 5/122-4 (West 2019). The State must either answer or move to dismiss the petition. 725 ILCS 5/122-5 (West 2019). If the State moves to dismiss the petition, it questions only its legal sufficiency. *People v. Ward*, 187 Ill. 2d 249, 255 (1999). The second-stage's purpose is not to resolve evidentiary questions. *Domagala*, 2013 IL 113688, ¶ 35. Unless the petition's allegations are positively rebutted by the record, they are to be taken as true. *Id.*

¶ 31 A court should dismiss a petition only if the petition's allegations of fact, taken as true and liberally construed in favor of the petitioner, fail to make a substantial showing that the petitioner's constitutional rights were violated. *Id.* To make such a showing, the petition's allegations must be supported by either the record in the case or accompanying affidavits. *Coleman*, 183 Ill. 2d at 381. Our review of a second-stage dismissal is *de novo*. *People v. Robinson*, 2020 IL 123849, ¶ 39; *People v. Childress*, 191 Ill. 2d 168, 174 (2000).

¶ 32 We begin with petitioner's claim that the petition adequately alleged that police and

prosecutors knew Cotton testified falsely to the grand jury, and that the State used that perjured testimony to convict petitioner. Even taking the well-pleaded allegations as true, we find that the amended petition and Cotton's affidavit fail to make a substantial showing of a constitutional violation.

¶ 33    When the State knowingly uses perjured testimony to obtain a criminal conviction, it violates the defendant's right to due process of law. *People v. Olinger*, 176 Ill. 2d 321, 345 (1997). But a due process violation lies only if the State *knew* the testimony to be false. *People v. Brown*, 169 Ill. 2d 94, 106 (1998). Absent an allegation that the State knew the testimony was false, or that there was a lack of diligence on the State's part to uncover its inaccuracy, there is no constitutional violation. *Id.* A witness falsely testifying, without the knowledge or direction of the State, is the action of a private individual, not State action, and thus does not implicate the due process clause. *Id.*

¶ 34    To support this claim, petitioner has attached an affidavit from Cotton. Cotton swears he did not hear petitioner make the three incriminating statements Cotton related to the grand jury, and what he said in his handwritten statement and to the grand jury were untrue. Importantly here, Cotton says he "told the grand jury what the police and the assistant state's attorney wanted me to tell them."

¶ 35    The parties sharply quarrel over the significance of this last sentence in the affidavit, though both find it ambiguous. To petitioner, it means the police and ASA who took Cotton's handwritten statement either told him to lie to the grand jury or knew he was lying. The State, meanwhile, argues that this sentence (taken as true) only proves Cotton was lying, not that the State directed him to do so or knew he was doing so.

¶ 36    Taken as true, that comment is not enough to make a substantial showing that the State

had knowledge of Cotton's perjury. A substantial showing of a constitutional violation means that, if proven at an evidentiary hearing, the defendant's well-pleaded allegations would entitle him to relief. *People v. Williams*, 2016 IL App (1st) 133459, ¶ 25. But this statement in the affidavit only establishes that Cotton perjured himself to the grand jury. It does not directly say the assistant State's Attorney or police told him what to say to the grand jury or suggest so. Nor does it allow us to infer the State knew about his perjury, even if it did not direct it.

¶ 37    By the time Cotton reached the grand jury, he had already spoken to the police and prosecutors and made a written statement. Prosecutors obviously put him before the grand jury to repeat, in sum and substance, the things he had communicated to them orally and in the written statement. In that sense, it is probably accurate to say that the police and prosecutors "wanted" him to say those same things before the grand jury, but it is too far a stretch to infer from that alone that these law enforcement officials knew his statements were false. It would surely not have been difficult for Cotton to say so, had that been the case—nor would it have been difficult, if that were the case, for appointed counsel to secure an amended affidavit from Cotton to put a finer point on the topic. This is not, after all, the first stage, where we look only for the "gist" of a claim; at the second stage, now with the assistance of counsel, we look for allegations that would entitle the petitioner to relief if true. See *id*.

¶ 38    Petitioner tries to fill in the gaps by hypothesizing that Cotton got a plum deal on the retail theft for which he was first arrested, which somehow suggests the State knew or should have known he perjured himself. We reject that claim for three reasons. For one, Cotton did not say so in his affidavit, even after counsel had appeared and could have amended his affidavit along with the petition itself. For another, a plea deal in exchange for helpful testimony does not, in and of itself, automatically suggest that the testimony procured is *false* testimony.

¶ 39    And third and equally importantly, this argument is definitively rebutted by the record. Recall that Cotton was arrested on the unrelated retail theft charge the day before he gave his handwritten statement to police. At trial, even while contradicting his grand jury testimony, Cotton repeatedly testified that neither police nor prosecutors threatened or promised him anything, even under petitioner's extensive cross-examination. For what it's worth, the ASAs and detective who spoke to Cotton likewise testified that they made no promises to petitioner in exchange for his testimony. But the bigger point is that, even while giving testimony favorable to petitioner at trial, discrediting (or at least not remembering) his grand jury testimony, Cotton was not willing to go so far as to testify that the State pressured him to give false testimony and in fact adamantly denied it more than once. Absent some statement in his affidavit disavowing that trial testimony, Cotton has not said enough in his affidavit for us to infer that the State in any way induced him to give false testimony before the grand jury.

¶ 40    So even if everything in Cotton's affidavit were deemed true, petitioner would not be entitled to relief. *Domagala*, 2013 IL 113688, ¶ 35. Indeed, postconviction counsel may have recognized as much in contemporaneously filing a section 2-1401 petition, claiming Cotton's perjured testimony should render petitioner's conviction void, regardless of whether the State knew or should have known of the perjury. *See*, *e.g.*, *People v. Cheeks*, 318 Ill. App. 3d 919 (2001) (reversing and remanding for consideration of defendant's claim that witness committed perjury under section 2-1401). But as noted, any claims regarding the 2-1401 petition have been forfeited. *See* Ill. S. Ct R. 341(h)(7) (eff. Oct. 1, 2020).

¶ 41    Without more concrete evidence to connect Cotton's perjury to the State, we are left with evidence that Cotton perjured himself before the grand jury (and, ostensibly, at petitioner's trial) and nothing else. As a conviction obtained with perjured testimony is not constitutionally infirm

unless the State knows or should know about it beforehand (*Brown*, 169 Ill. 2d at 106), petitioner has failed to make a substantial showing of a constitutional violation on this issue.

¶ 42     Petitioner next argues that he has substantially shown that trial and appellate counsel were ineffective for not challenging the admission of Cotton's handwritten statement at trial. Petitioner must demonstrate that these attorneys acted deficiently and that their deficiency resulted in prejudice to him, such that the outcome of the trial or appeal would likely have been different. *People v. Johnson*, 205 Ill. 2d 381, 405-06 (2002). The failure to satisfy either element is fatal to an ineffectiveness claim. *People v. Simpson*, 2015 IL 116512, ¶ 35.

¶ 43     Petitioner argues that the written statement was inadmissible hearsay and did not meet the "personal knowledge" requirement of the hearsay exception laid out in section 115-10.1 of the Code of Criminal Procedure. See 725 ILCS 5/115-10.1 (West 2010). In petitioner's eyes, had trial counsel challenged the handwritten statement, it would have been excluded, and the outcome of his trial would have been different. Along those lines, had counsel in his direct appeal argued trial counsel's ineffectiveness on this issue, petitioner would have prevailed in his appeal and won a new trial.

¶ 44     This may feel familiar; in petitioner's direct appeal, appellate counsel of whom petitioner now complains observed in a footnote that Cotton's handwritten statement was probably inadmissible. See *Lee*, 2012 IL App (1st) 102936-U, ¶ 14 n.2. In our own footnote, we said petitioner might be right. *Id.* But we also pointed out that the grand jury testimony, containing nearly identical evidence, was properly admitted. *Id.* Since petitioner did not address the error, we had no reason to elaborate, either. *Id.*

¶ 45     But the implication was clear, and what we insinuated before we now make canon: even if we assumed that the handwritten statement should not have made it to the jury—a question we

do not decide—petitioner was not prejudiced by its admission such that the outcome here is in doubt. In the end, it does not matter if the handwritten statement met Section 115-10.1's personal knowledge requirement, because as petitioner concedes, Cotton's grand jury testimony—which contained the same substantive information—was properly admitted under section (c)(1), as it was made under oath at a trial, hearing or other proceeding. 725 ILCS 5/115-10.1(c)(1) (West 2010).

¶ 46    So either way, the jury was going to hear some version of what Cotton previously said—specifically, that petitioner essentially confessed to him that Carter shot Peeples and Hawkins during a robbery. He thus cannot show that the omission of one of those two items of evidence, but not the other, would likely lead to a different result at trial; he cannot show prejudice by trial counsel.

¶ 47    Still, petitioner claims the erroneous admission of the handwritten statement prejudiced him because it improperly bolstered the grand jury testimony. We rejected a similar argument in *People v. Wilson*, 2012 IL App (1st) 101038, and *People v. Harvey*, 366 Ill. App. 3d 910 (2006), and do so again here. In both cases, the State presented recanting witnesses' prior statements pursuant to Section 115-10.1 that should not have been admitted. *Wilson*, 2012 IL App (1st) 101038, ¶ 56; *Harvey*, 366 Ill. App. 3d at 921. However, in both cases, the substance of those statements came in via properly admitted grand jury testimony. *Wilson*, 2012 IL App (1st), ¶ 56; *Harvey*, 366 Ill.App.3d at 921-22. On that basis, we rejected any claim that the admission of the improper statements required reversal.

¶ 48    Although the question in *Wilson* and *Harvey* was one of harmlessness, they are persuasive in analyzing petitioner's claim. Petitioner has no grounds to challenge Cotton's grand jury testimony. Further still, after being confronted by the State with his prior statements at

petitioner's trial, Cotton admitted he heard petitioner say most (though not all) of the incriminating statements. And during deliberations, the jury requested a copy of the grand jury testimony but did not ask for the handwritten statement, providing at least some indication that the grand jury testimony was a bigger focus than the handwritten statement.

¶ 49    Because some of the inculpatory statements contained in the handwritten statement came in through Cotton at trial, and *all* of them were introduced through his grand jury testimony, it is impossible to believe that this handwritten statement played a pivotal role in the outcome of this trial. So even if the admission of the handwritten statement were error—which we need not decide—we cannot say that there is a reasonable probability that the outcome of petitioner's trial would have been different if that statement had been excluded. Defendant thus cannot establish prejudice, and his claim of ineffectiveness for failing to object to the admission of that statement fails on that prong alone. See *Simpson*, 2015 IL 116512, ¶ 35.

¶ 50    That likewise settles any argument that *appellate* counsel was ineffective. Appellate counsel cannot be ineffective for failing to raise an issue that would not have been successful on direct appeal. *People v. Childress*, 191 Ill. 2d 168, 175 (2000).

¶ 51    For these reasons, the court properly dismissed both claims of ineffectiveness.

¶ 52                                    III. CONCLUSION

¶ 53    We affirm the dismissal of the postconviction petition in all respects.

¶ 54    Affirmed.